4 BAB LLC,

         Plaintiff,      1:19-cv-00889 (BKS/CFH)

v.

BEACON HEALTH OPTIONS, INC.,

         Defendant.

**Appearances:**

*For Plaintiff:*
Harold D. Gordon
Elizabeth L. Callahan
Couch White LLP
540 Broadway
Albany, NY 12201

*For Defendant:*
Andrew C. Rose
William E. Reynolds
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

  Plaintiff 4 BAB LLC ("BAB") brings this diversity action against Defendant Beacon Health Options, Inc. ("Beacon"). (Dkt. No. 9). The Amended Complaint requests a declaratory judgment as to whether an early termination clause of a lease agreement between Plaintiff and Defendant is in effect (First Cause of Action), or alternatively, to reform the lease (Fifth Cause of Action). (*Id.* ¶¶ 33–37, 60–65). Plaintiff also alleges Defendant anticipatorily and actually

breached its lease with Plaintiff (Second, Third, and Fourth Causes of Action). (*Id.* ¶¶ 38–59).

Presently before the Court is Defendant's motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), (Dkt. No. 12), which Plaintiff opposes. (Dkt. No. 14).[1] For the reasons that

follow, Defendant's motion is granted in part and denied in part.

## II.     FACTS[2]

In October 2010, landlord British American Development Corp. ("British American")

entered into a Lease Agreement with Defendant tenant, then named Value Options, Inc.,[3] for a

property located at 4 British American Boulevard in Latham, New York (the "Initial Lease").

(Dkt. No. 9, ¶ 4). The Initial Lease included an early termination clause which stated:

> 34. EARLY TERMINATION
>
> (b) Provided that Tenant is not in default in the keeping and performing of all of the terms and provisions of this Lease beyond all applicable cure periods Tenant shall have the right and option to accelerate the expiration date of this Lease to a date not earlier than May 14, 2015 and provided that Tenant provides twelve (12) months prior written notice of the early termination date and pays to Landlord within thirty (30) days thereafter the unamortized cost of the broker commission and the leasehold improvements and enhancements.

(the "Early Termination Clause"). (Dkt. No. 12-3, ¶ 34). The Initial Lease also defined an "Event

of Default" as, *inter alia*, "any failure of Tenant to pay any Rent or Additional Rent when due

---

[1] Defendant acknowledges that even if all of Plaintiff's claim are dismissed, two issues would still require resolution: (1) the amount of the unamortized costs it owes Defendant and (2) a determination of the prevailing party. (Dkt. No. 12-1, at 1).

[2] The facts are taken from the Amended Complaint. (Dkt. No. 9). The Court will assume the truth of, and draw reasonable inferences from, those well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). Additionally, the Court will consider the Initial Lease and the Amendment submitted by Defendant. (Dkt. Nos. 12-3, 12-4, 12-5). As Defendant argues, the Court can consider material extraneous to the Amended Complaint because Plaintiff relied "on the terms and effect of [the lease] in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[3] Value Options, Inc., later merged with Beacon Health Strategies LLC and became known as Beacon Health Options, Inc., the defendant in this case (Dkt. No. 9, ¶ 5).

2

and such failure continues uncured for fifteen (15) days after written notice specifying such failure is given to Tenant by Landlord." (*Id.* ¶ 11). The Initial Lease was set to expire on November 19, 2017. (Dkt. No. 9, ¶ 7).[4]

In May 2016, Defendant prepared a Request for Proposal ("RFP") regarding an amendment to the Initial Lease. (*Id.* ¶ 16). Section 11 of the RFP was labeled "Contraction Options" and stated that "Tenant requires the right to terminate up to 25% of its aggregate Leased Premises." (*Id.* ¶ 17).

In April 2017, British American and Defendant entered into an agreement to amend the lease (the "Amendment"). (*Id.* ¶ 8). The Amendment extended the term of the lease until December 2027. (*Id.* ¶ 10). It contained a clause (the "Contraction Clause") "permitting Beacon to contract or terminate a certain percentage of a combination of the leased premises and other premises leased by" Defendant "at 10 British American Boulevard, Latham, New York (the "10 BAB Lease")."[5] (Dkt. No. 9, ¶ 10). Specifically, the Contraction Clause states:

> Provided that there does not exist an Event of Default, Tenant shall have the right to contract up to, but no more than twenty-five percent (25%) of its Aggregate Leased Premises (as hereinafter defined) at the end of the 4th and 7th year of the Extended Term so long as Tenant provides nine (9) months' prior written notice and pays a contraction fee equal to the respective unamortized Tenant Improvements and Brokerage Commission costs at a six percent (6%) interest rate. The maximum aggregate contraction of Tenant's Aggregate Leased Premises is 34,699 rentable square feet. Tenant shall also bear the cost of any demising and adjustments to mechanical and electrical systems that may be necessary. The surrendered space must be reasonably configured and reasonably located in the Building relative to entrances/exits and access to mechanical systems so as to be functional and marketable. The term "Aggregate Leased Premises" as used in this section shall mean the

---

[4] The Initial Lease states that "[t]his Lease shall be governed in all respects by the laws of the State of New York without regard to its principles of conflicts of laws." (Dkt. No. 12-3, ¶ 38).

[5] According to the Amended Complaint, Defendant entered a second, separate lease for the premises at 10 British American. (Dkt. No. 9, ¶¶ 11, 14–15).

3

> combined Tenant leased premises of 23,347 rentable square feet at 4 British American Boulevard and 55,966 rentable square feet at 10 British American Boulevard (total of 79,313 rentable square feet) or the combined Tenant leased premises at 4 British American Boulevard and 10 British American Boulevard as adjusted by any Tenant contraction and excluding any future Tenant expansion under separate lease agreements.

(Dkt. No. 12-5, ¶ 12). The "10 BAB Lease contained a substantially identical Contraction Clause." (Dkt. No. 9, ¶ 11). The original 10 BAB Lease "contained an early termination right that had expired at the time of the Amendment." (*Id.* ¶ 15). The Amendment also contains a provision that reads: "In all other respects the [Initial] Lease is hereby ratified and confirmed" (the "Ratification Clause"). (Dkt. No. 12-5, ¶ 18).[6] The terms of the Amendment "were fully negotiated by the parties directly and/or through a real estate broker engaged by [Defendant]." (Dkt. No. 9, ¶ 8).

On November 27, 2018, Defendant wrote to Plaintiff, stating "[p]ursuant to Section 34 of the Lease, Tenant hereby notifies Landlord of Tenant's decision to exercise its right to accelerate expiration of Lease to November 30, 2019." (*Id.* ¶ 20). Plaintiff responded on December 5, 2018, and "reject[ed] [Defendant's] exercise of a purported right to terminate the Lease." (*Id.* ¶ 21). On December 21, 2018, Defendant wrote to Plaintiff reiterating its intent to terminate the Lease and "enclosing a check payable to B A Investors LLC in the amount of $167,809, representing [Defendant's] 'best estimate of unamortized broker costs based on the information available to Tenant.'" (*Id.* ¶ 22). On December 28, 2018, Plaintiff "return[ed] [Defendant's] check and . . . reject[ed] its attempt to terminate the lease." (*Id.* ¶ 23). The letter also noted that Defendant's payment failed to account for the "unamortized portion of the leasehold improvements and

---

[6] British American subsequently transferred ownership of the property and the Lease to Plaintiff, BAB, and Plaintiff thus "succeeded to the interests of British American and became and remains the landlord under the Lease." (Dkt. No. 9, ¶ 9).

enhancements, which together with the unamortized portion of broker commissions, our client presently values at approximately $700,000." (*Id.* ¶ 23).

On July 1, 2019, Defendant failed to pay its rent. (*Id.* ¶ 25). Plaintiff wrote Defendant on July 19, 2019, notifying it of the failure "to pay its Rent for July 2019." (*Id.* ¶ 26). The letter also notified Defendant that, pursuant to the Lease, "[i]f th[e] failure [to pay rent] continues uncured for fifteen (15) days from the date of this letter, such failure shall be deemed an Event of Default." (*Id.* ¶ 26). Defendant failed to pay the July rent within the fifteen-day cure period. (*Id.* ¶ 29). On August 8, 2019, Plaintiff received a payment from Beacon in the amount of $67,914.51. (*Id.* ¶ 31). On August 9, 2019, Defendant wrote Plaintiff that it considered this to be a payment of rent after an event of default. (*Id.* ¶ 32).

Plaintiff seeks a declaratory judgment regarding the effect of the Early Termination Clause, arguing that it "was rescinded, terminated and replaced by the Contraction Clause." (*Id.* ¶ 37). Plaintiff claims that Defendant breached the lease by terminating the lease, and also contends that even if the Early Termination Clause is still in effect, Defendant is not entitled to exercise its right to terminate because of its subsequent default. (*Id.* at 7–10). Finally, Plaintiff asserts that if declaratory judgment is not warranted it is entitled to reformation of the contract, reforming the parties' agreement to effect their intent that the Early Termination Clause was "rescinded, terminated and replaced by the Contraction Clause." (*Id.* at 10).

## III. STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the

5

factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

On a motion to dismiss a breach of contract claim the Court must "resolve any contractual ambiguities in favor of the plaintiff." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015). A claim should not be dismissed "if the plaintiff has an arguable claim under the contract." *Hermant Patel M.D., P.C. v. Bandikatla*, No. 18-cv-10227, 2019 WL 6619344, at *2, 2019 U.S. Dist. LEXIS 210405, *5 (S.D.N.Y. Dec. 5, 2019).

## IV. DISCUSSION

Defendant moves to dismiss the Amended Complaint on the grounds that the unambiguous contract language gave it the right to terminate the lease and, even if the Court found an ambiguity, Plaintiff's reformation cause of action lacks sufficient particularity, and Plaintiff failed to state a cause of action for breach of contract based upon the manner in which Defendant exercised the termination clause.

### A. Lease Ambiguity

Plaintiff opposes dismissal, arguing that "the Early Termination Clause [in the Initial Lease] and the Contraction Clause [in the Amendment] are inconsistent and at a minimum, ambiguous." (Dkt. No. 14, at 10). According to Plaintiff, the parties "agreed that the Contraction Clause was intended to vitiate and rescind the Early Termination Clause in the Lease" and the Contraction Clause "cannot be read consistently with any continued right to fully terminate the

6

Lease." (Dkt. No. 9, ¶¶ 12–13). Defendant, on the other hand, argues that "there is simply nothing inconsistent with having a right to give back certain limited amounts of space and having the right to fully terminate" and thus the plain language of the Lease is not ambiguous. (Dkt. No. 12-1, at 12).

As a threshold matter, "New York follows the common law rule that in interpreting a contract, the intent of the parties governs, and therefore, a contract should be construed so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (citation and internal quotation marks omitted). This intent is derived "from the plain meaning of the language employed." *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (quoting *Tigue v. Commercial Life Ins. Co.*, 219 A.D.2d 820, 821 (4th Dep't 1995). "[W]hen an agreement amends or modifies a prior contract, the 'modifying agreement should be construed in connection with the original contract in order to ascertain the entire intent of the parties.'" *T.M. Real Estate Holding, LLC v. Stop & Shop Supermarket Co. LLC*, No. 12-cv-1808, 2013 WL 603325, at *7, 2013 U.S. Dist. LEXIS 22448, at *18 (S.D.N.Y. Feb. 14, 2013) (quoting *R.J.E. Corp. v. Northville Indus. Corp.*, No. 01-cv-2749, 2002 WL 1396991, at *3, 2002 U.S. Dist. LEXIS 11741, at *12 (E.D.N.Y. June 25, 2002)), *aff'd*, 543 F. App'x 41 (2d Cir. 2013).

"Under New York law the initial interpretation of a contract is a matter of law for the court to decide" and "[i]ncluded in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) (internal quotation marks and citation omitted); *see also Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982) ("[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the

court."). When a contract's language is "clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010).

Ambiguity does not exist when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 355 (1978)). Conversely, "[a] contract is ambiguous when it is "reasonably susceptible of more than one interpretation." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (1986); *see also Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 773 (S.D.N.Y. 1990) ("[A] term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" (quoting *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987))).

"Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). It is particularly important that agreements in clear, complete documents be enforced according to their terms "in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (citation omitted).

Furthermore, "[c]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Maniolos*, 741 F. Supp. 2d at 569; *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (ambiguity

does not exist "where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning" (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957))).

In this case, the Initial Lease gave Defendant the right to terminate the lease early. (Dkt. No. 12-3, ¶ 34). Specifically, Defendant was given "the right and option to accelerate the expiration date of th[e] Lease to a date not earlier than May 14, 2015." (*Id.*). As Defendant notes, the Initial Lease "was ratified and confirmed," and there is no language abrogating its right to terminate the lease. (*Id.* ¶ 18). The agreement must, however, be interpreted to give full effect to all of its provisions, including the Contraction Clause. That provision granted Defendant the ability to "have the right to contract up to, but no more than twenty-five percent (25%) of its Aggregate Leased Premises . . . at the end of the 4th and 7th year of the Extended Term." (Dkt. No. 12-5, ¶ 12).

Plaintiff argues that Defendant cannot terminate its lease, which represents 29% of the combined leased space, without running afoul of its agreement, under the Contraction Clause, not to contract more than 25% of the combined lease space. Plaintiff thus argues that Defendant's termination is a 29% contraction of its leased space, in violation of the Contraction Clause.

Defendant, conversely, argues that the plain language of the lease is unambiguous and grants it rights to both terminate the lease early and contract up to 25% of the leased space. (Dkt. No. 12-1, at 12). According to Defendant, "[t]here is simply nothing inconsistent with having a right to give back certain limited amounts of space and having the right to fully terminate," (*id.*), because "contraction and termination rights are distinct *alternatives* that serve different purposes." (Dkt. No. 15, at 6). In Defendant's view, termination and contraction are "separate

9

and distinct valuable rights" that Defendant bargained for. (Dkt. No. 12-1, at 12). As such, Defendant argues, the Ratification Clause incorporates the Early Termination Clause into the Amendment.

An examination of the plain meaning of the words "terminate" and "contract" supports Defendant's argument. The Oxford English Dictionary defines terminate as "[t]o bring to an end, put an end to, cause to cease." Terminate, Oxford English Dictionary, https://www.oed.com/view/Entry/199426 (last visited Jan. 21, 2020). Contract is defined as "[t]o make smaller, reduce in amount, diminish the extent or scope of; to narrow." Contract, Oxford English Dictionary, https://www.oed.com/view/Entry/40330 (last visited Jan. 21, 2020). Thus, while termination implies something ceases to exist, contraction implies a continued existence that is limited in scope.

Plaintiff argues that "it would be illogical for a commercial landlord in 4 BAB's position to agree to both early termination rights and contraction rights in the same lease." (Dkt. No. 14, at 11). Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance. *See Kerin v. U.S. Postal Serv.*, 116 F.3d 988, 992 & n. 2 (2d Cir. 1997) (considering evidence of trade usage to determine that contract's reference to "sewerage service" was ambiguous). Terms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry. *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 180–81 (2d Cir. 2014). But here Plaintiff has not indicated that there is any specialized meaning of these terms in the real estate

industry or provided any basis to believe that they are not, as the Defendant contends "separate and distinct valuable rights."[7]

Plaintiff asks the Court to interpret the Contraction Clause, which grants Defendant the right to reduce the amount of space leased from Plaintiff while still maintaining its rights and duties set out in the lease, as inconsistent with the Early Termination Clause, which gives Defendant the right to accelerate the expiration of the lease and terminate it altogether. Looking at the Initial Lease and the Amendment as a whole, the Court does not find Plaintiff's interpretation reasonable. Plaintiff's argument that granting Defendant a right to contract nullified its previously held right to terminate "strain[s] the contract language beyond its reasonable and ordinary meaning." *Seiden*, 959 F.2d at 428 (quoting *Bethlehem*, 2 N.Y.2d at 459). Nothing within the four corners of the Amendment and the language of the Contraction Clause suggests that the contraction rights granted to Defendant negate the early termination rights granted by the Initial Lease. The rights are "distinct *alternatives* that serve different purposes." (Dkt. No. 15, at 6). As such, there is no ambiguity because the Amendment is not "reasonably susceptible of more than one interpretation." *Chimart*, 66 N.Y.2d at 573.

Given that lack of ambiguity, the Court declines to consider the extrinsic evidence alleged by Plaintiff. *See Giancontieri*, 77 N.Y.2d at 162 (declining to examine extrinsic evidence because "before looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract"). Interpreting a lease's meaning by focusing solely on the intent of the parties (conveyed by the language they chose) is particularly important where, as

---

[7] Plaintiff did not respond to the Defendant's citation of a commercial lease that contained both termination and contraction provisions.

11

here, the contract pertained to real property and "was negotiated between sophisticated, counseled business people negotiating at arm's length." *Vermont Teddy Bear*, 1 N.Y.3d at 475.

Accordingly, the Court dismisses Plaintiff's First, Second, and Third Causes of Action because they are all predicated on the lease's alleged ambiguity, and its assertion that the Early Termination Clause was rescinded by the Contraction Clause.

### B. Contract Reformation

Defendant argues that Plaintiff's request for reformation (Fifth Cause of Action) should be dismissed because Plaintiff "failed to allege mutual mistake with the required particularity" and "if there was any mistake at all, it was not a 'mutual' one." (Dkt. No. 12-1, at 18–22). Plaintiff argues that "reformation [of the lease] is warranted based of a mutual mistake by the parties" because "the parties came to an understanding that the 'Contraction Clause was intended to vitiate and rescind the Early Termination Clause in the 4 BAB Lease.'" (Dkt. No. 14, at 16 (quoting Dkt. No. 9, ¶ 12)).

"The Federal Rules impose more stringent pleading requirements on 'all averments of fraud or mistake' than it does on other claims." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 440 (E.D.N.Y. 2011) (quoting Fed. Rule Civ. P. 9(b)). Under 9(b), "a party alleging mistake must state the particular circumstances that constitute the mistake . . . [and] plaintiffs may meet the particularity requirement by alleging the nature of the mistake and when it occurred." *Id.*

Under New York law, "a claim of mutual mistake is stated where the allegations indicate that the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514 (2d Dep't 1999); *see also Chimart*, 66 N.Y.2d at 573. Accordingly, "[b]ecause the thrust of a reformation is that a writing does not set forth the actual agreement of the parties, generally neither the parol evidence rule nor the Statute of Frauds applies to bar

proof, in the form of parol or extrinsic evidence, of the claim agreement." *Chimart*, 66 N.Y.2d at 573. This leads to a "danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract." *Id.* As such, "there is a 'heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties' . . . and a correspondingly high order of evidence is required to overcome that presumption." *Id.* at 574 (quoting *Backer Mgt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219 (1978)). The party seeking reformation must "show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties." *Backer*, 46 N.Y.2d at 219.

In this case, Plaintiff alleges the parties "agreed that the Contraction Clause was intended to vitiate and rescind the Early Termination Clause." (Dkt. No. 9, ¶ 12). Plaintiff claims "this mutual intention is manifested in the RFP exchanged between the parties, the language of the Amendment and in the reciprocal language of the 10 BAB Lease, and in both parties' course of conduct." (*Id.* ¶ 64). As discussed *supra* Section IV.A, the Court does not find the language of the Amendment demonstrates an intent to nullify the Early Termination Clause.

Nonetheless, Plaintiff argues that the RFP provides evidence of this intention. The Amended Complaint alleges that Defendant prepared the RFP and sent it to Plaintiff in May 2016. (*Id.* ¶ 16). Section 11 of the RFP was labeled "Contraction Options" and stated that "Tenant requires the right to terminate up to 25% of its aggregate Leased Premises." (*Id.* ¶ 17). According to Plaintiff, the use of the term "right to terminate" in the RFP in the "Contraction Options" section, combined with the fact that "over the course of the following months" Defendant's representatives allegedly "referred to the 'contraction option' and the 'right to terminate' interchangeably" shows that both parties intended to replace the Early Termination

13

Clause with the Contraction Clause. (*Id.* ¶ 16). According to the Amended Complaint, the early termination right in the original 10 BAB lease had expired at the time of the Amendment, and the "reciprocal Contraction Clauses were unequivocally intended to provide [Defendant's] only rights to partially terminate its leases with respect to both leased properties." (*Id.* ¶ 15).

Defendant contends that the "right to terminate" language is "in proximity to 'Contraction Option' precisely because that right relates only to contracting 'up to 25% of the leased premises'" and this "says nothing about, nor in any way hints at the demise of [Defendant's] alternative option to terminate the entirety of the Lease." (Dkt. No. 12-1, at 15–16).

Plaintiff will ultimately have to provide "evidence of a very high order" to succeed in its reformation claim and "overcome the heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties." *Backer*, 46 N.Y.2d at 219. Nonetheless, the Court finds that Plaintiff has alleged a plausible clam for relief because it the Complaint provides the particular circumstances of "the nature of the mistake and when it occurred," *Barbagallo*, 820 F. Supp. 2d at 440. As such, the Court declines to dismiss Plaintiff's claim for reformation (Fifth Cause of Action).

### C. Defendant's Exercise of the Early Termination Clause

The Fourth Cause of Action alleges that even if the Early Termination clause was still in effect, Defendant "breached the terms of its contract with Plaintiff by attempting to terminate the Lease while in default." (Dkt. No. 9, ¶ 52). The Early Termination Clause gave the Defendant/tenant "the right and option to accelerate the expiration date" of the Lease "[p]rovided that Tenant is not in default in the keeping and performing of all of the terms and provisions of this Lease beyond all applicable cure periods." (Dkt. No. 12-3, ¶ 34). According to Plaintiff, "the Early Termination clause expressly conditions termination on the Tenant remaining in

compliance with its lease and '*not in default*' . . . [Defendant's] failure to pay rent was a subsequent Event of Default that prevents it from exercising the Early Termination Clause." (Dkt. No. 14, at 14).

Defendant argues that, according to the "plain language of the Lease and well-established law" subsequent default does not invalidate the early termination. (Dkt. No. 12-1, at 16). According to Defendant, because it was not in default "at the time of its exercise of" the Early Termination option, its subsequent untimely payment of July rent does not negate its right of early termination. (*Id.*) (emphasis omitted).

In support of this argument, Defendant cites several cases illustrating "the longstanding practice in New York of upholding the exercise of lease-options regardless of subsequent defaults." (*Id.*). For example, in *112 West 34th Street Associates L.L.C. v. 112-1400 Trade Properties LLC*, 118 A.D.3d 543, 544 (1st Dep't 2014), the court held that a tenant validly exercised a renewal option even though the tenant subsequently defaulted before the commencement of the renewal term. *See Souslian Wholesale Beer & Soda, Inc. v. 380-4 Union Ave. Realty Corp.*, 166 A.D.2d 435, 437 (2d Dep't 1990) (violations of a lease that occur after an option has been exercised "are ineffective to defeat the plaintiff's rights under the lease"). These cases are consistent with New York caselaw that once an option is exercised, a bilateral contract is created between the tenant and landlord. *See Cobalt Blue Corp. v. 184 W. 10th St. Corp.*, 180 A.D.2d 454, 457 (1st Dep't 1992); *Goldman v. Orange Cty. Chapter, New York State Ass'n for Retarded Children, Inc.*, 121 A.D.2d 683, 684 (2d Dep't 1986).

In this case, the Early Termination Clause states that "[p]rovided that Tenant *is* not in default . . . Tenant shall have the right and option to accelerate the expiration date of this Lease." (Dkt. No. 12-3, ¶ 34 (emphasis added)). Here, on November 27, 2018, Defendant exercised its

15

option to terminate the lease early by notifying Plaintiff of its decision to "exercise its right to accelerate expiration of Lease to November 30, 2019." (Dkt. No. 9, ¶ 20). Thus, Defendant validly exercised its option to terminate the lease early by not being in default when it provided notice.

Plaintiff's argument that the "Early Termination clause expressly conditions termination on the Tenant remaining in compliance with its lease," (Dkt. No. 14, at 14), is unavailing because it does not accurately reflect the wording of the clause. The Early Termination Clause does not expressly condition termination on Defendant remaining in compliance, rather, it expressly conditions Defendant's ability to exercise its option for early termination, evidenced through its notification, on not being in default at the time. There is no allegation that Defendant was in default in November 2018. (*See* Dkt. No. 9). As such, the Early Termination Clause is not "reasonably susceptible of more than one interpretation," *Chimart*, 66 N.Y.2d at 573.

Accordingly, the Court finds that Defendant did not breach the Lease by its default subsequent to exercising its early termination option. Nonetheless, the Court declines to dismiss Plaintiff's Fourth Cause of Action in its entirety. The Early Termination Clause also requires Defendant to "pa[y] to Landlord within (30) days [of notification] the unamortized cost of the broker commission and the leasehold improvements and enhancements." (Dkt. No. 12-3, ¶ 34). Plaintiff alleges Defendant has breached the lease because "it is undisputed that [Defendant] has not made these payments." (Dkt. No. 14, at 15). However, this assertion overlooks Defendant's timely attempt to pay and Plaintiff's rejection of this payment. (Dkt. No. 9, ¶¶ 22–23). Nonetheless, as Defendant acknowledges, an issue remains as to "the amount of the unamortized costs" it owes Plaintiff. (Dkt. No. 12-1, at 6 n.1).

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 12) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the Amended Complaint's request for a declaratory judgment (First Cause of Action), anticipatory breach claim (Second Cause of Action), and first breach of contract claim (Third Cause of Action) are **DISMISSED with prejudice**;[8] and it further

**ORDERED** that Defendant's motion to dismiss Plaintiff's Fourth and Fifth Causes of Action is **DENIED**.

**IT IS SO ORDERED.**

Dated: January 24, 2020
 Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[8] Plaintiff has not requested leave to amend its pleading. Even if it had, "an amendment is not warranted absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." *Shemian v. Research In Motion Ltd.*, 570 F. App'x 32, 37 (2d Cir. 2014) (quoting *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004)). As discussed in this decision, Plaintiff's First, Second, and Third Causes of Action are not viable as a matter of law and cannot be fixed with additional factual allegations. Accordingly, amendment is not warranted, and dismissal is with prejudice.